**Exhibit B**

******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************************

SUSAN NEIMAN *v.* YALE UNIVERSITY
(SC 16961)

Sullivan, C. J., and Borden, Katz, Vertefeuille and Zarella, Js.

*Argued April 14—officially released July 20, 2004*

*Jacques J. Parenteau*, for the appellant (plaintiff).

*Aaron S. Bayer*, with whom was *Kim E. Rinehart*, for the appellee (defendant).

*Jonathan L. Gould* and *Gary E. Phelan* filed a brief for the Connecticut Employment Lawyers Association as amicus curiae.

*Felix J. Springer* and *Jennifer L. Sachs* filed a brief for the Connecticut Conference of Independent Colleges as amicus curiae.

*Opinion*

SULLIVAN, C. J. The plaintiff, Susan Neiman, brought this action against her former employer, the defendant, Yale University (Yale), alleging breach of contract, breach of the implied covenant of good faith and fair dealing and negligent misrepresentation arising out of Yale's failure to offer her a tenured appointment to its faculty. The trial court granted Yale's motion to dismiss the plaintiff's claims because the plaintiff had not exhausted Yale's internal grievance procedures before filing her action. The plaintiff appealed to the Appellate Court from the judgment of dismissal, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1. We affirm the judgment of the trial court.

The plaintiff alleges the following facts that are relevant to our resolution of her claims. In the spring of 1988, Yale offered the plaintiff a position as an assistant professor in its philosophy department. At that time, she received a copy of the 1986 edition of Yale's faculty handbook. Her initial appointment as an assistant professor commenced January 1, 1989, and ended June 30, 1992. During 1990, Yale placed its philosophy department into academic receivership, which led to increased external supervision of the employment decisions in that department. In 1992, the plaintiff accepted a renewal of her appointment as an assistant professor for an additional five year term. In 1993, Robert Adams was appointed chairman of the philosophy department and the plaintiff was promoted to associate professor, without tenure. In addition, Yale issued a new 1993 edition of the faculty handbook.

In 1994, Adams instituted a policy in which advanced junior faculty members could ask to be considered for tenure within two years. Pursuant to the new policy, the plaintiff requested that Yale consider her for a tenured position in the department. Under the terms of the receivership, an advisory committee was charged with making appointments to the philosophy department faculty under the aegis of the provost of the university, Alison Richard. The advisory committee consisted of Adams and other faculty members from the school of arts and sciences, who were not in the philosophy department. The advisory committee rejected the plaintiff's request to be considered for tenure.

In April, 1995, the plaintiff received an offer from the University of Potsdam in Germany for a tenured position as a full professor in her area of specialty, the study of Immanuel Kant. The plaintiff told Adams of the offer and again requested that she be considered for a tenured position at Yale. Adams indicated that he was opposed to her being considered for tenure, but agreed to inform the advisory committee of her request.

After some time had passed and the plaintiff had

not received a response to her renewed request to be considered for tenure, she learned that Adams had not told the advisory committee of her offer at the University of Potsdam nor of her request to be considered for tenure. At that point, she went to both the vice-provost and to Richard and voiced her concerns that the process had been unfair and that Adams was biased against her.

Richard convened a meeting of the advisory committee and initiated the procedures for considering an applicant for a tenured position. In accordance with handbook procedures, the committee conducted a nationwide search to find the best candidate for the area of philosophy in which the plaintiff specialized. A "short list" of five candidates was developed. Each was asked to come and lecture at Yale. After viewing the lectures, four members of the philosophy department, including Adams, met and expressed their preference for an offer of tenure. The decision was split, with two in favor of the plaintiff and two, including Adams, opposed to offering the plaintiff tenure in favor of another candidate.

In an attempt to resolve the impasse, Richard offered to fund two tenured positions for Kant scholars in the philosophy department instead of one, so that both the plaintiff and the other candidate could be offered tenured positions. Jonathan Lear, a tenured philosophy professor, suggested an external committee of philosophy experts from outside Yale make the decision. Adams rejected both proposals.

Under the terms of the receivership, final tenure decisions were voted on by the advisory committee with the addition of the senior members of the philosophy department. On January 22, 1996, Richard informed the plaintiff that this body had voted by a narrow margin not to offer her a tenured position. The plaintiff believed that her application had been rejected because the persons on the advisory committee who were not members of the philosophy department improperly deferred to Adams' judgment. Although the plaintiff had two years of untenured employment remaining at Yale, she accepted employment elsewhere and left before her term expired. She did not challenge the final tenure decision through the grievance process contained in the 1993 edition of the faculty handbook.

Thereafter, in 1997, the plaintiff brought this action against Yale for damages allegedly sustained as the result of Yale's failure to offer her a tenured appointment. The complaint alleged breach of contract (count one), breach of the implied covenant of good faith and fair dealing (count two) and negligent misrepresentation (count three). The defendant filed a motion to dismiss all three counts on the ground that the trial court did not have subject matter jurisdiction over the action because the plaintiff had failed to exhaust the remedies available to her at Yale, namely, the internal

grievance procedure provided for by the faculty handbook.[1] Initially, the trial court granted the defendant's motion to dismiss with respect to the first two counts only. After granting Yale's motion to reargue, however, the trial court granted Yale's motion to dismiss the third count for negligent misrepresentation because it was inextricably entangled with the denial of tenure, which the plaintiff had failed to challenge internally before seeking relief from the court.

The plaintiff claims on appeal that the court improperly dismissed her complaint because: (1) the court improperly usurped the fact-finding role of the jury in determining that the faculty handbook constituted the terms of the employment agreement between the parties; (2) even if the trial court properly determined that the faculty handbook constituted a contract, Yale repudiated the contract; (3) the plaintiff substantially complied with the internal grievance procedures; (4) the exhaustion of remedies doctrine does not apply to the faculty handbook; and (5) it would have been futile for the plaintiff to utilize the internal grievance procedures.

"As a preliminary matter, we set forth the applicable standard of review. The standard of review of a motion to dismiss is . . . well established. In ruling upon whether a complaint survives a motion to dismiss, a court must take the facts to be those alleged in the complaint, including those facts necessarily implied from the allegations, construing them in a manner most favorable to the pleader. . . . A motion to dismiss tests, inter alia, whether, on the face of the record, the court is without jurisdiction. . . . Because the exhaustion [of administrative remedies] doctrine implicates subject matter jurisdiction, [the court] must decide as a threshold matter whether that doctrine requires dismissal of the [plaintiff's] claim. . . . [B]ecause [a] determination regarding a trial court's subject matter jurisdiction is a question of law, our review is plenary." (Internal quotation marks omitted.) *Brookridge District Assn.* v. *Planning & Zoning Commission*, 259 Conn. 607, 610–11, 793 A.2d 215 (2002).

Before considering whether the exhaustion of remedies doctrine applies, we entertain the plaintiff's contractual claims. We first address the plaintiff's claim that the trial court invaded the province of the jury by determining as a factual matter that the handbook constituted a contract. In support of this claim, the plaintiff points out that "whether [an employer's] personnel manual [gives] rise to an express contract between the parties [is] a question of fact properly to be determined by the jury." *Finley* v. *Aetna Life & Casualty Co.*, 202 Conn. 190, 199, 520 A.2d 208 (1987), overruled on other grounds, *Curry* v. *Burns*, 225 Conn. 782, 786, 626 A.2d 719 (1993). She has not explained, however, how this claim can be reconciled with the allegations of her own complaint that "[t]he [h]andbook

contained the terms and conditions of the plaintiff's employment at Yale," and that Yale has breached those terms and conditions. In other words, the plaintiff simultaneously claims that Yale is contractually bound by the provisions of the handbook and that the handbook does not constitute a contract. Under these circumstances, we conclude that the plaintiff was estopped from denying the existence of a contract and the trial court properly determined that a contract existed as a matter of law.

The plaintiff next claims that, even if the handbook constituted a contract, Yale repudiated the contract by breaching the provisions of the handbook when it placed the department in receivership and changed the process by which tenure decisions were made. The plaintiff cites *Vaca v. Sipes*, 386 U.S. 171, 87 S. Ct. 903, 17 L. Ed. 2d 842 (1967), in support of her claim. In that case, the United States Supreme Court stated: "An obvious situation in which the employee should not be limited to the exclusive remedial procedures established by the contract occurs when the *conduct of the employer* amounts to a repudiation of *those contractual procedures*." (Emphasis added.) Id., 185. "Repudiation can occur either by a statement that the promisor will not perform or by a voluntary, affirmative act that indicates inability, or apparent inability, substantially to perform." *Gilman v. Pedersen*, 182 Conn. 582, 584, 438 A.2d 780 (1981); see also *Cottman Transmission Systems, Inc. v. Hocap Corp.*, 71 Conn. App. 632, 639, 803 A.2d 402 (2002). Although ordinarily whether a repudiation has occurred is a question of fact; *M. Shapiro & Son Construction Co. v. Battaglia*, 138 Conn. 238, 244, 83 A.2d 204 (1951); the plaintiff has provided no explanation of how placing the department in receivership amounted to an indication that Yale would not or could not substantially comply with the grievance procedures in the handbook. Although the process for the consideration of tenure applications had changed due to the receivership status of the department, nothing in the record suggests that the receivership had any effect on the grievance procedures. Accordingly, we conclude that the trial court properly rejected this claim as a matter of law.

The plaintiff next claims that she substantially complied with the internal grievance procedures provided for in the faculty handbook. The plaintiff cites *Owens v. New Britain General Hospital*, 229 Conn. 592, 604, 643 A.2d 233 (1994), in support of her claim. In that case, we determined that a substantial compliance test was appropriate when considering whether a hospital had followed its bylaws when terminating a physician's medical staff privileges. Id. Even if we assume that the substantial compliance test applies under the circumstances of this case, however, the record shows that the plaintiff did not pursue a single grievance procedure provided by the handbook after her application for ten-

ure had been rejected. Accordingly, we conclude that the trial court properly rejected the claim as a matter of law.

The plaintiff next claims that the exhaustion of remedies doctrine generally does not apply when employee handbooks provide for an internal grievance procedure. We disagree.

The exhaustion of remedies doctrine is applied in a number of different situations; *Stepney, LLC* v. *Fairfield*, 263 Conn. 558, 565, 821 A.2d 725 (2003); including when an exclusive grievance or arbitration procedure is contained in a collective bargaining agreement and when an administrative appeal is taken. In both contexts, if a party has failed to avail itself of the arbitration or appeal process, the trial court is without subject matter jurisdiction to hear its claims. See id., 563 ("[i]t is a settled principle of administrative law that if an adequate administrative remedy exists, it must be exhausted before the Superior Court will obtain jurisdiction to act in the matter"); *Hunt* v. *Prior*, 236 Conn. 421, 431, 673 A.2d 514 (1996) ("[f]ailure to exhaust the grievance procedures deprives the court of subject matter jurisdiction" [internal quotation marks omitted]).

The rationale for the doctrine, however, is slightly different in each context. In the collective bargaining context, we have stated that, "[t]he purpose of the exhaustion requirement is to encourage the use of grievance procedures, rather than the courts, for settling disputes. A contrary rule which would permit an individual employee to completely sidestep available grievance procedures in favor of a lawsuit has little to commend it. . . . [I]t would deprive employer and union of the ability to establish a uniform and exclusive method for orderly settlement of employee grievances. If a grievance procedure cannot be made exclusive, it loses much of its desirability as a method of settlement. A rule creating such a situation would inevitably exert a disruptive influence upon both the negotiation and administration of collective [bargaining] agreements." (Internal quotation marks omitted.) *Hunt* v. *Prior*, supra, 236 Conn. 431–32.

In the administrative appeal context, "[a] primary purpose of the doctrine is to foster an orderly process of administrative adjudication and judicial review, offering a reviewing court the benefit of the agency's findings and conclusions. It relieves courts of the burden of prematurely deciding questions that, entrusted to an agency, may receive a satisfactory administrative disposition and avoid the need for judicial review. . . . Therefore, exhaustion of remedies serves dual functions: it protects the courts from becoming unnecessarily burdened with administrative appeals and it ensures the integrity of the agency's role in administering its statutory responsibilities." (Citations omitted; internal quotation marks omitted.) *Stepney, LLC* v. *Fairfield*,

supra, 263 Conn. 564–65.

This court previously has not considered the application of the doctrine to procedures set forth in employee manuals. Several of our sister jurisdictions have addressed this question, however, and they have held almost uniformly that the exhaustion of remedies doctrine applies when faculty handbooks provide internal grievance procedures. See *Krynicky* v. *University of Pittsburgh*, 560 F. Sup. 803, 807 (W.D. Penn. 1983) (university employee barred from bringing action for failure to exhaust internal remedies); *Berkowitz* v. *Harvard College*, 58 Mass. App. 262, 275–76, 789 N.E.2d 575 (2003) (same); *Muth* v. *Board of Regents of Southwest State University*, 887 S.W.2d 744, 750–51 (Mo. App. 1994) (same); *Snitow* v. *Rutgers University*, 103 N.J. 116, 124–25, 510 A.2d 1118 (1986) (same); *Long* v. *Samson*, 568 N.W.2d 602, 606 (N.D. 1997) (same); cf. *Law* v. *Howard University, Inc.*, 558 A.2d 355, 356–57 (D.C. App. 1989) (plaintiff had no obligation to exhaust administrative remedies because attempt would have been futile); *McDowell* v. *Napolitano*, 119 N.M. 696, 701, 895 P.2d 218 (1995) (exhaustion doctrine not absolute because plaintiff substantially complied with grievance procedures and had already appealed to highest authority at university).

We agree with the majority of jurisdictions that the exhaustion of remedies doctrine applies to the internal grievance processes provided by academic institutions. "Where employment rights are contractual, and the contract establishes an internal grievance procedure for resolving disputes, the procedure ought to be followed. . . . There are a number of reasons for the exhaustion requirement. First . . . it is part of the contractual bargain and defines the rights themselves." *Berkowitz* v. *Harvard College*, supra, 58 Mass. App. 275. To allow a plaintiff to sidestep these procedures would undermine the internal grievance procedure that the parties had agreed to and encourage other litigants to ignore the available process as well. *Krynicky* v. *University of Pittsburgh*, supra, 560 F. Sup. 808.

Second, academic institutions themselves are best suited to be the original forum for these types of disputes. The university officials and the plaintiff's peers are most familiar with the requirements for tenure, the operation of the institution's tenure process and the purposes underlying the handbook provisions. Id., 807–808. We agree that "[a tenure dispute] is precisely . . . the kind of dispute that courts should hesitate to resolve when the parties themselves have established the procedures to aid in [their] resolution. It is difficult to conceive of a collective-negotiations agreement in which the parties bring more sophisticated skills to the table." *Snitow* v. *Rutgers University*, supra, 103 N.J. 123.

Moreover, we previously have been reluctant to become entangled in substantive academic disputes

over tenure decisions because the decision of whom to grant tenure is an integral part of academic freedom. See *Craine* v. *Trinity College*, 259 Conn. 625, 646–47, 791 A.2d 518 (2002). "A court must be careful not to substitute its judgment improperly for the academic judgment of the school. A university's prerogative to determine for itself on academic grounds who may teach is an important part of our long tradition of academic freedom. . . . This academic freedom is rooted in the first amendment. . . . First amendment protection of academic freedom prevents courts from substituting their judgment for the judgment of the school. In other words, courts should not become Super-Tenure Review Committee[s]." (Citations omitted; internal quotation marks omitted.) Id., 646.

Third, these internal procedures do not preclude access to the courts should the grievant be dissatisfied with the ultimate result. They merely ensure that the grievant and the school have an opportunity to resolve the dispute before seeking redress in the courts, thereby conserving judicial resources.

The plaintiff claims that the exhaustion doctrine should not apply to the internal grievance procedures of academic institutions because that process is unlike both the collective bargaining process and the administrative appeal process. We disagree. As in the collective bargaining context, the handbook procedures are part of the bargain freely entered into by the parties. As in the administrative appeal context, the special knowledge of the persons positioned to review tenure related claims makes it preferable for the academic institution, rather than the courts, to be the original forum for redress.

The plaintiff also claims that the language of the handbook concerning the filing of a complaint is permissive, not mandatory. Again, we disagree. The relevant portion of the handbook provides: "In a case where a faculty member believes that a [Yale] policy has not been properly observed in the case of his or her reappointment or promotion, that his or her reappointment or promotion has not been adequately considered . . . the faculty member *may* request review of his or her complaint in accordance with the procedures specified below." (Emphasis added.)

Several authorities have determined that the use of the word "may" in reference to an internal grievance process does not automatically render that process permissive. See, e.g., *Republic Steel Corp.* v. *Maddox*, 379 U.S. 650, 658–59, 85 S. Ct. 614, 13 L. Ed. 2d 580 (1965) (although collective bargaining agreement stated that employee who has complaint *may* discuss it with his foreman, parties were not permitted to "avoid the contract procedure and its time limitations in favor of a judicial suit" and "[a]ny doubts must be resolved against such an interpretation"); *Muth* v. *Board of Regents of Southwest State University*, supra, 887 S.W.2d 750 (use

of word "may" in handbook did not permit plaintiff to ignore internal grievance procedure of university). In *Muth*, the plaintiff claimed that she was not required to exhaust her administrative remedies because the handbook provided that a tenure appeal "may" be made through the grievance process, as opposed to "shall" be made. The court rejected this claim, agreeing that although the plaintiff was not compelled to pursue administrative remedies, the language meant that the plaintiff had the choice of either forgoing the grievance procedure and accepting the decision or using the procedure available. Id. We find this reasoning persuasive and, accordingly, conclude that the language of the handbook is not merely permissive.

The plaintiff cites *Mayo* v. *Yale University*, Superior Court, judicial district of New Haven, Docket No. CV00 0440145S (February 7, 2002), in support of her contrary view. In that case, the trial court found that certain language used in the Yale employee handbook was permissive.[2] The handbook stated that " 'employees are encouraged' to use the [grievance] procedure and that they 'may do so without fear.' " Id. The court determined that this language suggested an option and did not create a mandatory process. Id. The handbook language in the present case, however, does not state that employees are merely "encouraged" to use the grievance process. Accordingly, we find the reasoning of *Muth* to be more persuasive.

The plaintiff finally claims that the futility exception to the exhaustion of remedies doctrine applies in this case. We disagree.

"One of the limited exceptions to the exhaustion rule arises when recourse to the administrative remedy would be demonstrably futile or inadequate." *Hunt* v. *Prior*, supra, 236 Conn. 432. "[W]e have recognized such exceptions only infrequently and only for narrowly defined purposes . . . such as when recourse to the administrative remedy would be futile or inadequate." *Stepney, LLC* v. *Fairfield*, supra, 263 Conn. 565. It is well established that "[a]n administrative remedy is futile or inadequate if the agency is without authority to grant the requested relief." (Internal quotation marks omitted.) *Mendillo* v. *Board of Education*, 246 Conn. 456, 467, 717 A.2d 1177 (1998). "It is futile to seek a remedy only when such action *could not* result in a favorable decision and *invariably* would result in further judicial proceedings." (Emphasis added; internal quotation marks omitted.) *Simko* v. *Ervin*, 234 Conn. 498, 507, 661 A.2d 1018 (1995). We have held that utilizing administrative remedies is not futile for purposes of the futility exception even when the decision maker has indicated that it will rule against the grievant. *Housing Authority* v. *Papandrea*, 222 Conn. 414, 432, 610 A.2d 637 (1992).

The plaintiff claims that employing the grievance pro-

cedures would have been futile because Richard had been aware of her complaint of unfairness before the final decision was made, and had failed to take any action, such as challenging Adams' decisions or changing the process to reduce Adams' influence. The plaintiff does not claim, however, that she specifically asked Richard to do either of these things. The plaintiff, therefore, effectively claims that Richard should have acted spontaneously to initiate and pursue a remedy on her behalf and that Richard's failure to do so rendered the grievance process futile. We disagree. Nothing in the futility doctrine supports the proposition that the failure of the decision maker to be an advocate for the claimant renders the remedy futile.

The plaintiff also apparently claims that, because Richard had indicated to the plaintiff that she had done everything possible to make the tenure evaluation fair, Richard would not have found any merit in the plaintiff's complaint if she had filed one and would not have forwarded it to the review committee, rendering the grievance process futile. We disagree. The mere possibility, or even likelihood, of an adverse decision does not render a remedy futile. "It is futile to seek a remedy only when such action *could not* result in a favorable decision . . . ." (Emphasis added.) *Simko* v. *Ervin*, supra, 234 Conn. 507. Accordingly, we conclude that it would not have been futile for the plaintiff to follow the grievance procedure set forth in the handbook.

The plaintiff also claims that the handbook did not provide adequate remedies because it did not allow for damages to be awarded with respect to her allegation of negligent misrepresentation. This court addressed a similar claim in *Hunt* v. *Prior*, supra, 236 Conn. 434. In that case, although the collective bargaining agreement did not allow for an award of punitive damages, attorney's fees or costs, we were not persuaded that the plaintiff's administrative remedies were inadequate because had the plaintiff followed the grievance procedures, he would have received "immediate consideration and review of the very issue of wrongful [suspension] that the plaintiff raises in this action." (Internal quotation marks omitted.) Id. "It is not the plaintiff's preference for a particular remedy that determines whether the remedy . . . is adequate . . . and an administrative remedy, in order to be adequate, need not comport with the plaintiffs' opinion of what a perfect remedy would be." (Citation omitted; internal quotation marks omitted.) Id.

Similarly, in the present case, had the plaintiff availed herself of the internal grievance procedures at Yale, she might not have incurred the damages for which she now seeks compensation. Further, the plaintiff could have sought redress for her claims in court had she not prevailed in the internal grievance process. Accordingly, we reject this claim.

The judgment is affirmed.

In this opinion the other justices concurred.

[1] Section III of the Yale University Faculty Handbook, entitled "Faculty Appointments: All Schools," contains subsection L, entitled "Decisions Not to Reappoint or Promote and Their Review." Subdivision 3 of subsection L sets forth the procedures available to a faculty member who "believes he or she has been treated in an unfair or discriminatory manner in connection with a decision about reappointment or promotion . . . ." Section III (L) (3) (a) provides: "Purpose. The procedures described in this section are available to any faculty member who believes that he or she has been treated in a manner inconsistent with [Yale] policies on reappointment or promotion. In a case where a faculty member believes that a [Yale] policy has not been properly observed in the case of his or her reappointment or promotion, that his or her reappointment or promotion has not been adequately considered, or that he or she has been discriminated against in matters of reappointment or promotion on the basis of race, color, religion, age, sex, sexual orientation, handicap or national or ethnic origin, the faculty member may request review of his or her complaint in accordance with the procedures specified below. It is not the purpose of these review procedures to consider substantive issues of professional competence."

The handbook procedures required an aggrieved faculty member to make a complaint within forty-five days of the final decision either to the provost or to the dean. The dean may informally resolve the complaint. If that is unsuccessful, the complaint is then referred to the provost. The provost may also attempt an informal resolution. The handbook states that "the [p]rovost will forward to a review committee those issues raised by the complaint which have not been resolved, except for any which the [p]rovost has concluded are not within the purview of the procedures or which are clearly without merit." The review committee, in turn, conducts an inquiry, interviews the complainant, along with any witnesses, and makes findings of fact, conclusions and recommendations in a written report. The provost must accept the committee's findings of fact but may accept, modify, or reject the review committee's conclusions and recommendations. The provost's decision is final. The handbook also provides that the review committee should refer the matter to the president, and not the provost, for a final decision if the provost has been significantly involved in the matter.

[2] The plaintiff also cites *School Administrators Assn.* v. *Dow*, 200 Conn. 376, 383 n.5, 511 A.2d 1012 (1986), in which we stated that the plaintiff's action "could be maintained if the agreement did not make the grievance-arbitration process the exclusive remedy for the parties." We also stated, however, that the agreement at issue in that case did not indicate that the parties intended the procedures to be other than the exclusive remedy. Id., 383–84 n.5. Thus, *Dow* merely stands for the proposition that such procedures are presumptively exclusive. See *Saccardi* v. *Board of Education*, 45 Conn. App. 712, 720, 697 A.2d 716 (1997) ("where nothing is said in the collective bargaining agreement about exclusivity, the agreement is considered to be the exclusive remedy").