# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
                                        )
**DR. THOMAS EDSALL and GRISEL**        )
**EDSALL,**                             )
                                        )
    **Plaintiffs,**       )
                                        )
    **v.**               )    **Civil Action No.**
                                        )    **04-40106-FDS**
**ASSUMPTION COLLEGE,**                 )
**DR. THOMAS R. PLOUGH,**               )
**DR. JOSEPH F. GOWER, and**            )
**DR. JOHN F. McCLYMER,**               )
                                        )
    **Defendants.**       )
_____)

## MEMORANDUM AND ORDER ON
## MOTIONS TO DISMISS AND MOTIONS TO AMEND

**SAYLOR, J.**

This is a claim of reverse discrimination, arising out of a decision by Assumption College

not to hire the plaintiff, Dr. Thomas Edsall, for a position in the College's History Department.

Dr. Edsall is a white male who contends that he was unfairly passed over for a tenure-track

position in favor of a Hispanic female. Dr. Edsall alleges claims for unlawful race and sex

discrimination, violation of the equal-protection provisions of the United States and

Massachusetts Constitutions, and various common-law torts. His wife, Grisel Edsall, also

alleges a claim for loss of consortium.

Pending before the Court are two motions to dismiss under Fed. R. Civ. P. 12(b)(6) for

failure to state a claim upon which relief can be granted. One, filed by defendant John F.

McClymer individually, seeks to dismiss all claims against him, and the other, filed by the

defendants collectively, seeks to dismiss six of the nine counts in their entirety and parts of two

others.  Also pending are motions by defendants to amend the answer and to amend the motion

to dismiss, both of which seek to assert the defense of failure to exhaust administrative remedies.

**I.** **Background**

The following facts are as alleged in the complaint.[1]

Assumption College is a private four-year institution located in Worcester,

Massachusetts.  Between 2000 and 2003, plaintiff Thomas Edsall taught in the History

Department at Assumption.  Beginning in fall 2000, Dr. Edsall taught European and United

States History on a part-time basis, and, for the academic year 2002-03, he was a full-time

visiting Assistant Professor of Latin American History.  During his three years at the College,

Dr. Edsall's classes were well-attended by students, and he received exceptional student

evaluations.  He also received a prestigious book prize.

During the relevant period, Dr. Thomas R. Plough was the President of the College; Dr.

Joseph P. Gower was the Provost and Dean of Faculty; and Dr. John F. McClymer was a

Professor of History at the College.

In October 2002, the College announced a vacancy for a tenure-track position in the

History Department to teach Latin American History.  Dr. McClymer served as the chair of the

search committee assigned to interview candidates and fill the vacancy.

Dr. Edsall applied for the vacant position, for which he was qualified.  Nevertheless, in

late November 2002, Dr. McClymer informed Dr. Edsall that he should seek employment

elsewhere because "[Drs.] Plough and Gower were intent on hiring a minority candidate in an

---

[1] This recitation of facts is, of course, plaintiff's version of events, as set forth in the complaint.  The issue here is the sufficiency of the proposed pleading, not whether the evidence actually supports those allegations.

effort to increase diversity at [the College]." Dr. Edsall is a white male who was born in the United States.

Sometime before February 2003, Dr. Edsall learned that he was one of three finalists for the position. The other two finalists were a woman of Hispanic descent, Rosa Carrasquillo, and a woman of German descent.

In February 2003, the History Department formally recommended Dr. Edsall for the position at an annual salary with full benefits. Drs. Plough and Gower, however, rejected the search committee's recommendation and instead selected Rosa Carrasquillo. According to Dr. Edsall, the "true motivation" for the decision was the fact that Dr. Edsall is a white male.

The teaching position held by Dr. Edsall during the 2002-03 academic year was a one-year position that apparently expired by its terms in spring 2003. Dr. Edsall desired the tenure-track position and would have accepted it if it had been offered to him. Instead, Dr. Edsall was offered a part-time position for fall 2003 at a salary of approximately $6,000 for the semester, with no benefits. He declined the offer and relocated to New York City, where he continued to search for an academic position.

Based on those facts, Dr. Edsall and his wife, Grisel Edsall, filed a nine-count complaint in this Court on June 4, 2004, alleging the following claims against the four defendants: (1) race and sex discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e; (2) race discrimination under 42 U.S.C. § 1981; (3) denial of equal protection under the Fourteenth Amendment to the United States Constitution and Part I, Article 10 of the Massachusetts Constitution; (4) race and sex discrimination under the Massachusetts Fair Employment Practices Act, Mass. Gen. Laws ch. 151B, and violation of Mass. Gen. Laws ch.

214, §1C, which provides a right to freedom from sexual harassment; (5) breach of the implied

covenant of good faith and fair dealing; (6) intentional and negligent infliction of emotional

distress; (7) race and sex discrimination under the Massachusetts Equal Rights Act, Mass. Gen.

Laws ch. 93, §102; (8) tortious interference with prospective business advantage; and (9) loss of

consortium.

On July 6, 2004, defendants filed the two pending motions to dismiss for failure to state a

claim upon which relief can be granted under Fed. R. Civ. P. 12(b)(6).  Dr. McClymer has

moved to dismiss all claims against him individually, and all defendants collectively have moved

to dismiss various claims.

## II.     **Standard of Review**

A court may not dismiss a complaint for failure to state a claim under Fed. R. Civ. P.

12(b)(6) "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of

his claim which would entitle him to relief."  *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).  In

considering the merits of a motion to dismiss, the court may look only to the facts alleged in the

pleadings, documents attached as exhibits or incorporated by reference in the complaint, and

matters of which judicial notice can be taken.  *Nollet v. Justices of the Trial Court of Mass.*, 83

F. Supp. 2d 204, 208 (D. Mass. 2000), *aff'd*, 248 F.3d 1127 (1st Cir. 2000).  Furthermore, the

court must accept all factual allegations in the complaint as true and draw all reasonable

inferences in the plaintiff's favor.  *Langadinos v. American Airlines, Inc.*, 199 F.3d 68, 69 (1st

Cir. 2000).

III.     **Analysis**

    A.    **The Claims Against Dr. McClymer**

Dr. McClymer has moved to dismiss all claims against him on the grounds that the complaint does not make any specific allegations that he engaged in wrongful conduct. Plaintiffs oppose the motion on the grounds that (1) their complaint is sufficient under liberal notice-pleading standards, and (2) the motion is premature, inasmuch as discovery may reveal further facts to bolster their claims against Dr. McClymer.

A court may properly dismiss a complaint under Rule 12(b)(6) only if "'it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.'" *Educadores Puertorriquenos en Accion v. Hernandez*, 367 F.3d 61, 66 (1st Cir. 2004) (quoting *Hishon v. King & Spaulding*, 467 U.S. 69, 73 (1984)). The Federal Rules of Civil Procedure "do not contain a heightened pleading standard for employment discrimination cases." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510 (2002). Thus, a complaint alleging discrimination under Title VII need not include specific facts establishing a prima facie case, but "instead must contain no more than 'a short and plain statement of the claim showing that the pleader is entitled to relief.' Fed. Rule Civ. Proc. 8(a)(2)." *Id*. at 508.

Nevertheless, a liberal pleading standard is not the same as no standard at all. A complaint must still "set forth minimal facts as to who did what to whom, when, where, and why." *Educadores Puertorriquenos*, 367 F.3d at 68. And a court may not uphold a complaint based solely on "bald assertions, unsupportable conclusions, and opprobrious epithets." *Id.* (internal quotation omitted).

The complaint contains the following factual allegations concerning Dr. McClymer: (1)

Dr. McClymer was a professor in the History Department and the chair of the search committee organized to interview candidates and fill the tenure-track position, ¶¶ 6, 11; (2) in or around late November 2002, McClymer told Dr. Edsall that he "should seek employment elsewhere because defendants Plough and Gower were intent on hiring a minority candidate in an effort to increase diversity" at Assumption College, ¶ 12; and (3) the search committee recommended Dr. Edsall for the tenure-track position, ¶ 15. Paragraph 15 of the complaint further alleges that Drs. Plough and Gower rejected the search committee's recommendation of Dr. Edsall and selected Rosa Carrasquillo for the position. And Paragraph 16 alleges that Drs. Plough and Gower—i.e., *not* Dr. McClymer—were the ones who, motivated by race and gender discrimination, decided not to offer the tenure-track position to Dr. Edsall.

The complaint thus contains no factual allegations that Dr. McClymer was involved, directly or indirectly, in any wrongdoing. In fact, the complaint suggests the opposite: Dr. McClymer chaired the search committee that *recommended* Dr. Edsall for the tenure-track position, and he advised Dr. Edsall that *others* intended to hire a minority candidate. Under the most generous view of notice pleading, that is simply not enough.

It is true that the complaint, in multiple instances, characterizes the conduct of Dr. McClymer as unlawful or discriminatory in conclusory terms. *See* Complaint, ¶¶ 21, 27, 32, 33, 37 42, 45, 49, 53, 54. For example, Paragraph 27 states, "By refusing to hire Dr. Edsall for the tenure track position on the basis of his race, Defendants [Assumption College], Plough, Gower and McClymer violated Plaintiff Edsall's rights as defined by 42 U.S.C. § 1981." The Court is not required, however, to accept such "bald assertions" and "unsupportable conclusions" as a substitute for factual allegations. Indeed, those legal conclusions are not only unsupported by

the factual allegations of the complaint; they are, to a large extent, contradicted by them.

The Court also rejects plaintiffs' request to stay its ruling on the motion to dismiss until after they have had a chance to depose Dr. McClymer. The purpose behind a motion to dismiss brought under Rule 12(b)(6) is to challenge the sufficiency of the complaint. *Swierkiewicz*, 534 U.S. at 511. The complaint here, at least as it applies to Dr. McClymer, does not meet the requisite standard. Plaintiffs are not permitted to sue someone, without any factual basis, in the vague hope that something may turn up in discovery. *See* Fed. R. Civ. P. 11.

Accordingly, because the plaintiffs have failed to state any claim upon which relief can be granted as to Dr. John F. McClymer, all counts against him will be dismissed. The Court will now turn to the motion to dismiss filed by the defendants collectively, which addresses the various counts of the complaint.

### B.     The Claims of Individual Liability under Title VII

Count 1 alleges violations of Title VII by the College and Drs. Plough and Gower. The individual defendants have moved to dismiss this count on the grounds that individuals, as opposed to "employers," cannot be held liable under Title VII.

Under Title VII, an "employer" is prohibited from engaging in certain discriminatory employment practices. 42 U.S.C. § 2000e-2(a)(1). The statute defines the term "employer" as "a person engaged in an industry affecting commerce who has fifteen or more employees . . . and any agent of such person." 42 U.S.C. § 2000e(b).

Although the First Circuit has not decided whether there is individual liability under Title VII, "every circuit court that has interpreted Title VII's definition of 'employer' and the majority of District Courts in the First Circuit . . . have concluded that Congress did not intend to impose

7

individual liability upon agents of an employer." *Healy v. Henderson*, 275 F. Supp. 2d 40, 44-45 (D. Mass. 2003) (collecting cases). The phrase "and any agent of such a person" was intended by Congress to establish traditional respondeat superior liability. *Id.* at 45. *But see, e.g., Ruffino v. State Street Bank & Trust Co.*, 908 F. Supp. 1019, 1048 (D. Mass. 1995) ("[T]he plain meaning of § 2000e(b) [is that] both employers as entities, and their agents, as individuals, are to be bound by Title VII's dictates.").[2]

This Court agrees with the overwhelming weight of authority that Title VII does not provide for individual liability. Accordingly, Count 1 will be dismissed as to Drs. Plough and Gower.

### C.     **The Equal Protection Claims**

Count 3 alleges violations of the equal-protection guarantees of the Fourteenth Amendment to the United States Constitution and Article 10 of Part I of the Massachusetts Constitution. Defendants move to dismiss this count on the grounds that the complaint does not allege that any of the defendants are state actors.

With limited exceptions, the Fourteenth Amendment applies to acts of the states, not to those of private persons or entities. *The Civil Rights Cases*, 109 U.S. 3, 11 (1883); *Logiodice v. Trustees of Me. Cent. Inst.*, 296 F.3d 22, 26 (1st Cir. 2002). Similarly, "claims under the Massachusetts Constitution require a 'deprivation of rights fairly attributable to the State.'" *Delmonte v. Laidlaw Envtl. Svcs., Inc.*, 46 F. Supp. 2d 89, 97 (D. Mass. 1999) (quoting *Tynecki*

---

[2] According to a leading employment-discrimination treatise, "[a]lthough not definitively settled as to whether an individual employee, such as a supervisor or manager, may be held individually liable under the ADEA, the overwhelming majority of recent cases hold that they cannot." Barbara Lindemann & Paul Grossman, ABA Section of Labor & Employment Law, *Employment Discrimination Law*, at 401 (3d ed. 2002 Supp.) (collecting cases).

*v. Tufts Univ. Sch. of Dental Med.*, 875 F. Supp. 26, 30 n.5 (D. Mass. 1994)).

Plaintiff has not alleged any state action on the part of the College or its employees, and indeed has not opposed defendants' motion to dismiss these claims.  Accordingly, Count 3 will be dismissed as to all defendants.

D.    **The Sexual Harassment Claim**

Count 4 of the complaint alleges unlawful employment practices that violate Mass. Gen. Laws ch. 151B and Mass. Gen. Laws ch. 214, § 1C.  Chapter 214, § 1C provides that "[a] person shall have the right to be free from sexual harassment. . . ."  Defendants move to dismiss the Chapter 214 claim on the grounds that plaintiffs have alleged no acts of sexual harassment.

The complaint makes no such allegations, and plaintiffs do not oppose defendants' motion on that issue.  Accordingly, Count 4 will be dismissed to the extent that it claims a violation of Chapter 214, § 1C.

E.    **The Chapter 151B Claim Against Dr. Plough**

Count 4 also alleges sex and race discrimination in violation of Mass. Gen. Laws ch. 151B.  Dr. Plough seeks dismissal of this claim against him because, he asserts, Dr. Edsall failed to name him by name or position in his complaint filed with the Massachusetts Commission Against Discrimination ("MCAD") and the Equal Employment Opportunity Commission.

Dr. Plough is correct that a plaintiff cannot maintain a Chapter 151B claim against any defendant not "named" in the administrative charge filed with the MCAD.  *See Butner v. Department of State Police*, 60 Mass. App. Ct. 461, 467-68 (2004).  The Court must examine whether the putative defendant's conduct was put at issue by the MCAD charge and whether he had notice of, and an opportunity to conciliate, the MCAD charge.  *Horney v. Westfield Gage*

*Co.*, 95 F. Supp. 2d 29, 36 (D. Mass. 2000); *Chapin v. University of Mass. at Lowell*, 977 F. Supp. 72, 76 (D. Mass. 1997). Inexplicably, however, no party has placed Dr. Edsall's MCAD charge in the record, and thus the Court is unable to examine it and determine whether Dr. Plough was named either in form or substance.[3] Accordingly, the Court will deny the motion to dismiss Count 4 against Dr. Plough.

### F.    The Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing

Count 5 of the complaint alleges a breach of the implied covenant of good faith and fair dealing. Specifically, plaintiff alleges that defendants breached the covenant by refusing to hire Dr. Edsall to the tenure-track position on account of his race and gender.

Massachusetts recognizes a claim for a breach of the implied covenant of good faith and fair dealing in the employment context as "a common law exception to the general doctrine that an at-will employee may be terminated without liability for virtually any reason." 45 Scott C. Moriearty et al., *Massachusetts Practice, Employment Law* § 3.1 (2d ed. 2003). Where Chapter 151B applies, however, it provides "the exclusive remedy for employment discrimination not based on preexisting tort law or constitutional protections." *Charland v. Muzi Motors, Inc.*, 417 Mass. 580, 586 (1994); *see also Bhawan v. Fallon Clinic*, 5 F. Supp. 2d 64, 67 (D. Mass. 1998) (good-faith-and-fair-dealing claim based on wrongful termination barred by the availability of Chapter 151B); *Ruffino*, 908 F. Supp. at 1053 (same); *Melley v. Gillette Corp.*, 19 Mass. App. Ct. 511, 513 (1985), *aff'd*, 397 Mass. 1004 (1986). Plaintiffs have drawn the Court's attention to no cases upholding a claim for the breach of the implied covenant of good faith and fair dealing

---

[3] The Court may have properly considered the MCAD charge in connection with this motion because it is referred to in the complaint and because it is a public document. *See Chapin*, 977 F. Supp. at 76 n.3.

10

based on alleged unlawful discrimination in hiring.

Furthermore, Massachusetts cases "have held employers liable for breach of the implied covenant of good faith and fair dealing only when they have *terminated* an employee." *McCone v. New Eng. Tel. & Tel. Co.*, 393 Mass. 231, 234 (1984) (emphasis added); *see* Moriearty, *supra*, § 3.2. A job applicant cannot recover under an implied covenant of good faith and fair dealing for a prospective employer's failure to hire him, inasmuch as he has performed no services for the employer. *See Sands v. Ridefilm Corp.*, 212 F.3d 657, 663 (1st Cir. 2000). Dr. Edsall was not terminated; he simply was not offered the tenure-track position.

Accordingly, Count 5 will be dismissed as to all defendants.

### G.    The Claim for Intentional and Negligent Infliction of Emotional Distress

Count 6 alleges intentional and negligent infliction of emotional distress. In essence, plaintiff claims that defendants engaged in a pattern of extreme and outrageous conduct in failing to hire him for the tenure-track position. Defendants maintain that these claims are barred by the exclusivity provisions of the Massachusetts Workers' Compensation Act ("WCA"), Mass. Gen. Laws ch. 152.

The WCA provides the exclusive means by which an employee can recover for personal injuries sustained in the course of and arising out of his or her employment, including claims for intentional and negligent infliction of emotional distress. *Dorn v. Astra USA*, 975 F. Supp. 388, 395 (D. Mass. 1997) (citing *Green v. Wyman-Gordon Co.*, 422 Mass. 551, 558 (1996)).[4] The

---

[4] Personal injuries for emotional and mental disabilities only fall within the WCA's exclusivity "where a significant contributing cause of such disability [is] an event or series of events occurring within the employment." *See id.* § 1(7A). Emotional and mental disabilities clearly include injuries for intentional and negligent infliction of emotional distress. *See e.g. Clarke v. Kentucky Fried Chicken of Cal., Inc.*, 57 F.3d 21, 27-29 (1st Cir. 1995) (negligent infliction of emotional distress); *Tennaro v. Ryder Sys., Inc.*, 832 F. Supp. 494, 500 (D. Mass. 1993) (intentional infliction of emotional distress).

WCA defines an employee as a person "in the service of another under any contract of hire, express or implied, oral or written."  Mass. Gen. Laws ch. 152 § 1(4).

Here, the Court has serious doubts about whether the alleged emotional distress suffered by Dr. Edsall was a personal injury arising out of and in the course of his employment.  *See* Mass. Gen. Laws ch. 152 § 26.  Indeed, the entire premise of Dr. Edsall's claim is that he suffered emotional distress as a result of *not* being hired for the tenure-track position.  He is not claiming emotional distress arising out of the termination of his one-year employment as a visiting Assistant Professor—a claim that presumably would be barred by the exclusivity provision of the WCA.  *See, e.g., Bertrand v. Quincy Mkt. Cold Storage & Warehouse Co.*, 728 F.3d 568, 572 (1st Cir. 1984) (claim for intentional infliction of emotional distress stemming from plaintiff's termination was barred by the exclusivity provision of the WCA); *Hamilton v. Baystate Med. Educ. & Research Found., Inc.*, 866 F. Supp. 51, 56-57 (D. Mass. 1994) (claims for intentional and negligent infliction of emotional distress barred by the WCA).[5]

In any event, the Court need not decide the issue, because the emotional-distress claims fail on other grounds.  To state a claim for intentional infliction of emotional distress under Massachusetts law, the plaintiff must allege:

> (1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was "extreme and outrageous," was "beyond all possible bounds of decency" and was "utterly intolerable in a civilized community"; (3) that the actions of the defendant were the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was "severe" and of a nature "that no reasonable man could be expected to endure it."

---

[5] Of course, if Dr. Edsall had never worked at the College and claimed emotional distress arising out of its decision not to hire him, his claim would not fall within the WCA because he was never an employee.

*Agis v. Howard Johnson Co.,* 371 Mass. 140, 144-45 (citations omitted); *accord Brown v. Hearst Corp.,* 54 F.3d 21, 27 (1st Cir. 1995); *see Borden v. Paul Revere Life Ins. Co.,* 935 F.2d 370, 380 (1st Cir. 1991). Liability "cannot be predicated upon mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Foley v. Polaroid Corp.*, 400 Mass. 82, 99 (1987).

Defendants' conduct, as alleged in the complaint, is simply not sufficiently extreme and outrageous to support liability for intentional infliction of emotional distress. According to Dr. Edsall, defendants engaged in a pattern of extreme and outrageous conduct by deliberately selecting a Hispanic female candidate over him notwithstanding his qualifications. Even taking these allegations as true, "the mere fact that the defendants' conduct may turn out to be violative of the plaintiff['s] civil rights does not, in and of itself, necessitate a finding that the conduct is sufficiently egregious to state a claim for intentional infliction of emotional distress." *Guckenberger v. Boston Univ.*, 957 F. Supp. 306, 319 (D. Mass. 1997) (citing *Marques v. Fitzgerald,* 99 F.3d 1, 6-7 (1st Cir.1996)); *see also Sinai v. New Eng. Tel. & Tel. Co.*, Civ. A. No. 88-0840-S, 1990 WL 150015, *5 (D. Mass. Sept. 13, 1990) (concluding that defendants' repeated denials of plaintiff's application of employment because of plaintiff's religion and national origin "may have been discriminatory, but . . . were not utterly intolerable in a civilized community").

Finally, to the extent that Dr. Edsall is making a claim for negligent, as opposed to intentional, infliction of emotional distress, the claim fails because he does not allege any physical harm or physical manifestation of emotional distress. *See Gutierrez v. Massachusetts Bay Transp. Auth.*, 437 Mass. 396, 412-13 (2002).

Accordingly, Count 6 will be dismissed as to all defendants.

**H.     The Claim under the Massachusetts Equal Rights Act**

Count 7 alleges a violation of the Massachusetts Equal Rights Act, Mass. Gen. Laws ch. 93, § 102 ("MERA").  Specifically, plaintiff claims that by refusing to hire him for the tenure-track position on the basis of his race and gender, defendants violated his rights as defined by MERA.[6]  Defendants argue that this claim is barred by the exclusivity provision of Chapter 151B and therefore must be dismissed.

Chapter 151B, where it can be invoked,[7] preempts a claim under MERA.  *Cargill v. Harvard Univ.*, 60 Mass. App. Ct. 585, 604 (2004) ("MERA does not create an independent right to vindicate an alleged wrong that can otherwise be redressed under G.L. c. 151B."); *see also Green,* 422 Mass. at 557-58; *Charland*, 417 Mass. at 586 ("[W]here applicable, G.L. c. 151B provides the exclusive remedy for employment discrimination not based on preexisting tort law or constitutional protections."); *Agin v. Federal White Cement, Inc.,* 417 Mass. 669, 672 (1994). Chapter 151B unquestionably applies to the employment-discrimination allegations in this case, and therefore the MERA claim is barred.

Plaintiff nevertheless argues that it would be premature for the Court to dismiss the

---

[6] The pertinent portion of MERA provides:

All persons within the commonwealth, regardless of sex, race, color, creed or national origin, shall have, except as is otherwise provided or permitted by law, the same rights enjoyed by white male citizens, to make and enforce contracts, to inherit, purchase, to lease, sell, hold and convey real and personal property, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

Mass. Gen. Laws ch. 93, § 102(a).

[7] Chapter 151B does not apply to employers with fewer than six employees or to certain other limited classes of employees.  Morierty et al., *supra*, § 10.4 n.2.

MERA claim at this juncture. He suggests that, although defendants have not moved to dismiss the Chapter 151B claim yet, they may do so at some point in the future, and thus the Court, by dismissing the MERA claim now, could prevent him from asserting it later. This argument is completely without merit. The Court cannot avoid the pre-emptive effect of Chapter 151B by deferring its decision on the MERA claim.

Accordingly, Count 7 will be dismissed as to all defendants.

## I.        The Claim for Tortious Interference with Prospective Business Advantage

Count 8 of the complaint alleges a claim for tortious interference with prospective business advantage. Specifically, Dr. Edsall alleges that during 2002-2003, he was employed at the College under the terms of a contract and that the individual defendants, with a discriminatory motive, "knowingly induced [the College] to breach its contract with [him] by various means, including, without limitation, by failing to offer [him] a tenure-track position with [the College]." Defendants move to dismiss Count 8 on the grounds that Drs. Plough and Gower, as high-ranking officers of the College, are unable to interfere with any relationship Dr. Edsall had with the College.

As a preliminarily matter, plaintiff does not precisely identify which tort he intends to assert: intentional interference with contract or intentional interference with prospective business advantage. Although the complaint labels Count 8 as "tortious interference with prospective business advantage," plaintiff's allegations and arguments are directed to interference with contract. They are distinctly different torts. 37 Joseph R. Nolan & Laurie J. Sartorio, *Massachusetts Practice, Tort Law* § 98 (2d ed.).

A claim for intentional interference with prospective business advantage is, as its name

suggests, oriented toward the future.  The elements of that tort are "(1) a business relationship or contemplated contract of economic benefit; (2) the defendant's knowledge of such relationship; (3) the defendant's intentional and malicious interference with it; (4) the plaintiff's loss of advantage directly resulting from the defendant's conduct."  *Id.*

In contrast, intentional interference with contract is retrospective in nature.  Thus, to state a claim for that tort, a plaintiff must allege "(1) he had an existing contract with a third party, (2) the defendant knew that fact, (3) the defendant induced the other person to break the contract and (4) damage was incurred."  Nolan & Sartorio, *supra*, § 97.

It appears that plaintiff does not intend to allege a claim for intentional interference with contract.  The only contract identified in the complaint is Dr. Edsall's temporary employment contract for the 2002-03 term; the only "breach" identified is the College's failure to offer Dr. Edsall a tenure-track position.  The Court strongly doubts that the contract *required* Dr. Edsall to be offered a tenure-track position; indeed, the complaint does not assert any claim for breach of contract.  The Court will thus assume that plaintiff intends to claim intentional interference with prospective business advantage.

To prove intentional interference with prospective business advantage, plaintiff must establish that defendant had an improper motive or used improper means.  *James L. Mintner Ins. Agency v. Ohio Indem. Co.*, 112 F.3d 1240, 1250 & n.5 (1st Cir. 1997) (citing *United Truck Leasing Corp. v. Geltman*, 406 Mass. 811 (1990)).  Unlawful discrimination can provide a basis for finding an improper motive.  *See Abramian v. President & Fellows of Harvard Coll.*, 432 Mass. 107, 122 (2000) (national origin); *Gram v. Liberty Mut. Ins. Co.*, 384 Mass. 659, 663 (1981) (age).

16

It is well-settled that a party cannot interfere with its own contractual or advantageous relationships.  *Harrison v. NetCentric Corp.*, 433 Mass. 465, 476 n.12 (2001) (citing *Appley v. Locke*, 396 Mass. 540, 543 (1986)).  To the extent, then, that the complaint seeks to assert a tortious-interference claim against the College, the claim will be dismissed.

The tortious-interference claims against the individual defendants stand on a different footing.  In the words of the First Circuit:

> Tortious interference takes an intriguing turn in the employment context.  Common sense suggests that an employee may not sue her employer for interfering with its own contract, and the case law verifies this situation.  Despite the employer's immunity, however, a supervisor may be personally liable if he tortiously interferes with a subordinate's employment relationship.  This seeming paradox has led the Massachusetts courts to construct a matrix of rules designed to ensure against irrational results.

*Zimmerman v. Direct Fed. Credit Union*, 262 F.3d 70, 76 (1st Cir. 2001) (citations and footnote omitted).

One set of rules applies to those supervisors who are so closely identified with the corporation as to be considered its alter ego.  *Id.* at 76 n.4.  Massachusetts law recognizes that certain corporate officers "might be so closely identified with the corporation itself, and with its policies, that [they] should not be treated as . . . third person[s] in relation to corporate contracts, susceptible to charges of tortious interference when [they] cause[] the corporation to breach its contractual obligations."  *Schinkel v. Maxi-Holding, Inc.*, 30 Mass. App. Ct. 41, 50 (1991); *see also Harrison*, 433 Mass. at 478.  Defendants here argue that Drs. Plough (the President of the College) and Gower (its Provost and Dean of Faculty) are so closely affiliated with Assumption College and its policies that they cannot be treated as third parties to any relationship between the College and Dr. Edsall.

Whatever the merits of that position, resolution of the question necessarily turns on factual issues, such as the decision-making processes within the College regarding faculty hiring. At present, there is no evidentiary record before the Court, and indeed virtually no information about Drs. Plough and Gower other than their job titles. The Court cannot resolve the matter on a motion to dismiss. *See Boyle v. Boston Found.*, 788 F. Supp. 627, 630 (D. Mass. 1992); *Schinkel*, 30 Mass. App. Ct. at 50 (stating that the issue "should not be considered . . . on the bare allegations of the complaint"); *see also Zimmerman*, 262 F.3d at 76 n.4 (whether a supervisor is a corporation's alter ego turns on the application of a "nuanced set of rules").[8]

Plaintiffs, in turn, argue that the mere existence of allegations that the supervisors engaged in unlawful discrimination in the hiring process is enough to support a claim for tortious interference against the supervisors. There is certainly authority supporting the proposition that a supervisor who engages in unlawful discrimination is not acting within the scope of his employment and in his employer's legitimate interests, and therefore such a supervisor can be liable for tortious interference with the employee's relations with the employer. *E.g., Legoff v. Trustees of Boston Univ.*, 23 F. Supp. 2d 120, 130 (D. Mass. 1998) ("Nor can unlawful acts—including unlawful gender discrimination, threats, and retaliation—be considered to be within the scope of a supervisor's duties.").[9]

---

[8] See also *Harrison*, 433 Mass. at 478, where the Supreme Judicial Court could not conclude as a matter of law that an individual defendant "controlled the operation of the corporation to the degree that he should be viewed as its alter ego," even though the summary-judgment record showed that the defendant "[was] a founder of the company, the chairman of the board, the chief executive officer, . . . a large shareholder of the closely held corporation[,] . . . and alone made the decision to fire the plaintiff."

[9] Defendants rely heavily on an Illinois case, *Quest v. Board of Trustees of Community College District No. 525*, 629 N.E.2d 807 (Ill. App. 1994), in support of their position that plaintiff has not stated a tortious-interference claim against Drs. Plough and Gower. As the First Circuit has explained, however, Massachusetts is "far more plaintiff-friendly" on the issue of supervisor liability than other jurisdictions, including, specifically, Illinois. *Zimmerman*, 262 F.3d at 76 n.5.

18

The issue arises almost exclusively in the wrongful termination context, and proceeds according to the following chain of reasoning:  If a supervisor's actions in discharging an employee are within the scope of his or her supervisory duties and in furtherance of the employer's legitimate interests, the supervisor is merely the agent of the employer and is entitled to a qualified privilege as to claims for tortious interference.  *Zimmerman*, 262 F.3d at 76; *see also, e.g.*, *Wright v. Shriners Hosp. for Crippled Children*, 412 Mass. 468, 476 (1992); *Appley*, 396 Mass. at 543; *Sereni v. Sportswear Mfg. Corp.*, 24 Mass. App. Ct. 428, 432-33 (1987).[10]   If, however, the supervisor acted with actual malice, and such malice "was the controlling factor in the supervisor's interference," the privilege may be overcome.  *Zimmerman*, 262 F.3d at 76; *accord Alba v. Sampson*, 44 Mass. App. Ct. 311, 315 (1998).  "Massachusetts treats proof of actual malice as a proxy for proof that a supervisor was not acting on the employer's behalf, and deems such proof sufficient to overcome the qualified privilege."  *Zimmerman*, 262 F.3d at 76; *see also, e.g.*, *Bennett v. City of Holyoke*, 230 F. Supp. 2d 207, 229 (D. Mass. 2002); *Legoff*, 23 F. Supp. 2d at 130; *O'Brien v. New Eng. Tel. & Tel. Co.*, 422 Mass. 686, 687, 690 (1996).  Unlawful discrimination can be a form of actual malice.  *Weber v. Community Teamwork, Inc.*, 434 Mass. 761, 782 (2001).  Thus, proof of unlawful discrimination can be proof of actual malice; which is tantamount to proof that a supervisor was not acting on the employer's behalf;

---

[10] Generally, a supervisor has a "privilege" to discharge an at-will employee that may be overcome if the supervisor acted with malice.  *See, e.g., Gram*, 384 Mass. at 663 ("Because [defendants] were acting in the scope of their employment responsibilities, [plaintiff] acknowledges that each was privileged to act as he did unless he acted out of malevolence, that is, with 'actual' malice.").  The Court assumes for present purposes that an official empowered to make hiring decisions exercises a similar privilege—that is, he or she may choose not to hire a candidate without facing tort liability unless in doing so he or she acts with actual malice.  *See Walker v. Waltham Hous. Auth.*, 44 F.3d 1042, 1049 n.1 (1st Cir. 1995) ("When an employer or supervisor is acting within the scope of his employment responsibilities, the *hiring and firing* decisions are privileged unless he acted with malevolence.") (emphasis added)); *Alba*, 44 Mass. App. Ct. at 315 (reasoning that supervisor had a "conditional privilege" to give advice concerning a reorganization plan that resulted in plaintiff's not being selected for a newly created position). The parties have not briefed this issue, however, and the Court need not decide it here.

19

which permits the supervisors to be found liable for tortious interference.

That line of cases, however, almost exclusively involves (1) claims of tortious interference with contractual relations, (2) arising in the context of a wrongful termination of an employee, (3) where the supervisor is alleged to have engaged in unlawful discrimination *against* a member of a protected class. It is far from clear whether that line of cases should be applied to a case that involves (1) a claim of tortious interference with prospective business advantage, (2) arising in the context of an alleged "wrongful failure to hire," (3) where the supervisors are alleged to have engaged in unlawful discrimination *in favor of* a member of a protected class.

Moreover, it is not true that proof of unlawful discrimination is always proof of the actual malice required to show that the supervisor was acting independently of the employer's interest.[11] The Supreme Judicial Court has described the required proof of the element of "actual malice" as follows:

> Where, as here, the claim is asserted against an individual officer of the employer, the plaintiff is required to show, as to "improper motive or means," that the "controlling factor" in the alleged interference was "actual" malice; "implied" malice is not sufficient. We have defined the requisite "malice" in this context as "a spiteful, malignant purpose, unrelated to the legitimate corporate interest of the employer."

*Weber*, 434 Mass. at 781-82 (internal citations omitted). It is easy to fit many forms of

---

[11] Courts occasionally seem to assume that intentional discrimination could *never* be within the scope of a supervisor's duties. *See, e.g., Legoff*, 23 F. Supp. 2d at 130 ("Nor can unlawful acts—including unlawful gender discrimination, threats, and retaliation—be considered to be within the scope of a supervisor's duties."); Moriearty et al., *supra*, §6.48 ("Liability in a mixed-motive interference case is of far more than academic interest, especially in employment discrimination cases where the allegation is one of status-based discrimination, which is never easy to characterize as intended to further the employer's interest."). It may be that in a case involving invidious discrimination against a minority, that assumption is correct; an employer's legitimate interests rarely, if ever, could be furthered by such discrimination. As noted below, however, reverse discrimination cases potentially present much more difficult issues.

discrimination, e.g., hate-based discrimination by whites against African-Americans, within this definition. Nonetheless, it may be possible to discriminate against someone without the requisite degree of malice. *Id.* at 782 ("As to motive, a conclusion that [defendant] unlawfully discriminated against [plaintiff] might, *but does not necessarily*, support an inference of actual malice.") (emphasis added). Reverse discrimination, in particular, may arise from benign motives (e.g., promotion of diversity), rather than "spiteful" or "malignant" motives (e.g., dislike of white people)—even if such discrimination is unlawful.

Because the issue inevitably turns on motivations and intent, it is ill-suited for resolution in a motion to dismiss. Here, plaintiffs allege that Drs. Plough and Gower were motivated by discriminatory animus when they rejected the recommendation of the search committee to hire Dr. Edsall and instead hired a different candidate for the tenure-track position. Plaintiffs further allege that Dr. McClymer advised Dr. Edsall that "defendants Plough and Gower were intent on hiring a minority candidate in an effort to increase diversity at [the College]." A conclusion that Drs. Plough and Gower unlawfully discriminated against Dr. Edsall "might, [but] does not necessarily, support an inference of actual malice." *Id.* The Court cannot decide on the basis of the complaint alone whether, as alleged, discriminatory animus was the determinative cause of the adverse hiring decision sufficient to establish liability on the part of Drs. Plough and Gower. *See id.* at 782-83. It therefore cannot dismiss the tortious-interference claim.

Accordingly, defendants' motion to dismiss Count 8 of the complaint will be granted with respect to the College and denied with respect to Drs. Plough and Gower.

### J.    The Claim for Loss of Consortium

Finally, Count 9 asserts a claim for loss of consortium on behalf of Grisel Edsall, who

alleges that, because of "the injuries and damages sustained by her husband, . . . [she] has been deprived of her husband's society and companionship, and has suffered a loss of consortium." Complaint ¶ 57. Defendants move to dismiss this count solely on the theory that neither state nor federal law permits a loss-of-consortium claim based on an alleged civil-rights violation.

It is clear that "[t]he spouse of an alleged federal civil rights victim is not permitted an ancillary cause of action for loss of consortium." *Tauriac v. Polaroid Corp.*, 716 F. Supp. 672, 673 (D. Mass. 1989). Thus, Mrs. Edsall cannot derive her loss-of-consortium claim from Dr. Edsall's Title VII action or his claim under 42 U.S.C. § 1981.

Whether such an action can be brought ancillary to a state-law discrimination claim is considerably murkier. "As a general rule, a claim for loss of consortium requires proof of a tortious act that caused the claimant's spouse personal injury." *Sena v. Commonwealth*, 417 Mass. 250, 264 (1994). Thus, some courts have concluded that loss-of-consortium damages similarly cannot be predicated on violations of the Massachusetts civil-rights statutes. *E.g., Tauriac*, 716 F. Supp. at 673; *but see Lorenc v. Be Free, Inc.*, 136 F. Supp. 2d 1, 5 & n.5 (D. Mass. 2001) (reserving ruling on the question whether a loss-of-consortium claim can be premised on a violation of the Massachusetts civil-rights statutes, adopting the approach of *Silva v. Hit or Miss*, 73 F. Supp. 2d 39, 43 (D. Mass. 1999)); *Zhang v. Massachusetts Inst. of Tech.*, 46 Mass. App. Ct. 597, 606-07 (1999) (reserving decision on this issue because evidence did not support a claim for loss of consortium).

At present, the Court need not decide whether a loss-of-consortium claim can be premised on a violation of Chapter 151B. Because Dr. Edsall has alleged a common-law claim for tortious interference, which has not been dismissed, the ancillary loss-of-consortium count

need not be dismissed.  Accordingly, the defendants' motion to dismiss Count 9 will be denied.

**IV.    Motions to Amend**

Finally, defendants have moved to amend both their answer and their motion to dismiss to assert an affirmative defense of lack of subject-matter jurisdiction, based on plaintiffs' alleged "failure to exhaust administrative remedies."  Specifically, defendants argue that Dr. Edsall was required to avail himself of the internal faculty grievance procedure at Assumption College prior to seeking judicial intervention.

Plaintiffs oppose defendants' motions to amend as futile, on six separate grounds:  (1) the internal faculty grievance procedure did not apply to him in his role as applicant for the tenure-track position; (2) the internal faculty grievance procedure at the College is merely permissive, not mandatory; (3) the procedure expressly provides that it is not intended to "restrict the right of either party to pursue public legal proceedings"; (4) defendants waived any right to require Dr. Edsall to participate in those proceedings by participating in a mediation with Dr. Edsall prior to this lawsuit; (5) defendants waived the administrative proceedings by waiting too long to raise the proceedings as a defense; and (6) it would have been futile for Dr. Edsall to participate in the administrative proceedings because Dr. Plough, one of the alleged wrongdoers, "figures prominently in the administrative procedure."

**A.    Standard for Motion to Amend**

A motion for leave to amend a pleading "shall be freely given when justice so requires." Fed. R. Civ. P. 15(a).  Futility of the proposed amendment is, however, a basis for denial of a motion to amend.  *See Foman v. Davis*, 371 U.S., 178, 182 (1962) ("In the absence of any apparent or declared reason—such as . . . futility of amendment, etc.—the leave sought should,

as the rules require, be 'freely given.'").

In this case, the futility analysis requires the Court to determine whether defendants have a viable defense for failure to exhaust "administrative" remedies. As explained below, the Court concludes that they do not, and therefore the proposed amendments are futile.

### B.    Analysis

Assumption College, like many colleges and universities, has an internal grievance procedure to address a variety of faculty complaints related to employment and academic issues. Appendix II, Paragraph 2 of the Assumption College Faculty Handbook provides:

> <u>Definition of a Grievance</u>  A faculty member who believes that he/she has not been accorded due process as specified in this document or who believes that considerations which violate his/her academic freedom . . . have contributed to the situation may file a grievance in any of the following situations:
>
> a.    when he/she has received notice that he/she has not been granted tenure;
>
> b.    when he/she has not had a renewal of his/her contract;
>
> c.    when he/she has been issued a terminal contract;
>
> d.    when he/she has not been promoted;
>
> e.    when he/she believes that he/she has received unfair or inequitable treatment in any other matter, whether or not covered by this document.

Defendants suggest that this provision required Dr. Edsall, prior to seeking relief from the courts, to file a grievance regarding the decision not to hire him for the tenure-track position.[12]

Defendants rely heavily on a recent decision of the Connecticut Supreme Court, *Neiman*

---

[12] Defendants do not specifically identify which section of Paragraph 2 they believe would cover Dr. Edsall's particular situation. Presumably it would be either subsection (e) (the catch-all provision) or possibly (d) (failure to promote); the others would not appear to apply to the facts of this case. In particular, section (a) would not appear to extend to a decision not to hire a contract faculty member to a tenure-track position, as opposed to a decision denying tenure itself.

*v. Yale University*, 270 Conn. 244 (2004).  *Neiman* involved a decision by Yale University not to offer tenure to one of its tenure-eligible assistant professors.  *Id*. at 247-48.  The plaintiff did not challenge the final tenure decision through the grievance process contained in the faculty handbook.  *Id.* at 248-49.  Instead, the plaintiff brought a civil action against the university alleging breach of contract, breach of the implied covenant of good faith and fair dealing, and negligent misrepresentation.  *Id.* at 246.  The trial court dismissed the plaintiff's claims because she had not exhausted the university's internal grievance procedures before filing her action.  *Id.*

The Connecticut Supreme Court affirmed.  *Id.*  The court framed the issue as a contract problem, observing that, "'[w]here employment rights are contractual, and the contract establishes an internal grievance procedure for resolving disputes, the procedure ought to be followed.'"  *Id.* at 255 (quoting *Berkowitz v. Harvard Coll.*, 58 Mass. App. Ct. 262, 275 (2003)).  The court also recognized that academic institutions are better suited to be the original forum for disputes arising out of tenure decisions than are courts and that important issues of academic freedom attach to decisions involving tenure.  *Id.* at 255-56.

*Neiman* has very little to do with the allegations in this case.  This is an employment-discrimination case, which now comprises the following claims:  (1) discrimination based on sex and race in violation of Title VII and Chapter 151B; (2) discrimination based on race in violation of 42 U.S.C. § 1981; (3) tortious interference with prospective business relations against Drs. Plough and Gower; and (4) loss of consortium, which is ancillary to the tortious-interference claim.  Nothing in *Neiman* supports the conclusion that claims of discrimination or common-law tort based on discrimination should first be addressed by internal grievance procedures before becoming the subject of litigation.

Furthermore, as to the civil rights claims, there is First Circuit precedent directly to the contrary. *Brennan v. King*, 139 F.3d 258 (1st Cir. 1998), involved allegations by a tenure-track assistant professor that Northeastern University and various university officials denied him tenure because he was gay and HIV-positive. Brennan alleged violations of the Americans with Disabilities Act and the Rehabilitation Act of 1973, as well as various Massachusetts anti-discrimination statutes and a host of common-law claims, including breach of contract. 139 F.3d at 262. The trial court granted summary judgment on the ground that Brennan had failed to pursue the grievance procedure specified in his employment contract. *Id.*

The First Circuit reversed in part, rejecting defendant's argument that the plaintiff was contractually required to pursue the internal grievance procedure as a precursor to filing his discrimination claims. *Id.* at 268. The court wrote:

> Appellees have . . . sought to invoke the exhaustion doctrine in order to require Brennan to exhaust potential *contractual* remedies. With respect to Brennan's federal and state civil rights claims, we find no ground to require this type of exhaustion. The federal statutes and the Massachusetts constitutional and statutory provisions invoked by Brennan reveal no indication that potential contractual avenues of relief must be pursued prior to suit. Furthermore, appellees have not cited, and we have not found, any cases suggesting that such a requirement inheres in the relevant federal or state provisions.

*Id.* Thus, with respect to his discrimination claims, the court found that Brennan had fully exhausted his required remedies simply by pursuing his claims with the EEOC and MCAD. *Id.*[13]

---

[13] The *Brennan* court held that the breach-of-contract claim was on a different footing from the statutory discrimination claims, and that plaintiff was required to pursue the Northeastern grievance procedure outlined in his employment contract before maintaining suit for breach of that contract. 139 F.3d at 270. The court relied on *O'Brien v. New England Telephone & Telegraph Co.*, 422 Mass. 686 (1996), for the narrow proposition that "as a matter of Massachusetts employment law, one who alleges wrongful termination based upon a contract of employment which includes a grievance procedure cannot seek vindication of the claim in court without first invoking the contractual grievance procedure." *Id.* Finding Brennan's breach-of-contract claims "not meaningfully distinguishable" from the wrongful-discharge claims in *O'Brien*, the court affirmed the entry of summary judgment as to the contract claims. *Id.*

Likewise, tort claims are not ordinarily affected by the existence of an internal grievance procedure. *See O'Brien*, 422 Mass. at 687, 695-96 (upholding jury verdict in favor of plaintiff on claim of intentional interference with contractual relations against supervisor but concluding that wrongful-discharge claim against employer failed because plaintiff did not first follow grievance procedure prescribed in personnel manual); *cf. Brennan*, 139 F.3d at 269-70 & n.13 (holding that plaintiff was required to pursue the grievance procedure outlined in his employment contract before maintaining his breach-of-contract claim, but nevertheless concluding that there was "nothing peculiar about" plaintiff's claims for fraud, misrepresentation, intentional and/or negligent infliction of emotional distress, and civil conspiracy "that would require exhaustion of contractual procedures"). Dr. Edsall was therefore not required to pursue his claim for intentional interference through the Assumption College grievance procedure.

Accordingly, Dr. Edsall was not required to participate in the internal grievance procedure prior to instituting suit for any of the claims that remain in this suit. The motion for leave to amend the answer and the motion to dismiss will be denied on grounds of futility.

## V.    Conclusion

For the reasons set forth above, the motion to dismiss filed by Dr. John F. McClymer (Docket No. 10) is GRANTED. The motion to dismiss filed by the defendants collectively (Docket No. 11) is GRANTED IN PART and DENIED IN PART, as follows:

I.     Count 1 of the complaint is dismissed as to Drs. Plough and Gower;

II.    Counts 3, 5, 6, and 7 of the complaint is dismissed as to all defendants;

III.   Count 4 of the complaint is dismissed as to all defendants with respect to any

27

claims asserted under Mass. Gen. Laws ch. 214, § 1C; and

IV.    Count 8 of the complaint is dismissed as to Assumption College only.

Defendants' motion to amend the answer and motion to amend the motion to dismiss (Docket

Nos. 23, 25) are DENIED.

**So Ordered.**

/s/ F. Dennis Saylor_____
F. Dennis Saylor IV
United States District Judge

Dated: March 31, 2005

28